*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————
                                                :
In re: MONCADA NJ SOLAR 201, LLC,    :          Civil Action No. 18-0110 (FLW)
———————————————————————:
                                                :
MONCADA NJ SOLAR 201, LLC,            :                **OPINION**
                                                :
                         Appellant,     :
                                                :
             v.                                 :
                                                :
ISE AMERICA, INC.                             :
                                                :
                         Appellee.      :
———————————————————————:

**WOLFSON, United States District Judge**:

Presently before the Court is the appeal of Moncada NJ Solar, LLC ("Moncada" or "Appellant") from the December 19, 2017 decision of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), granting ISE America, Inc. and ISE Farms, Inc.'s (collectively, "ISE" or "Appellee") motion to dismiss Moncada's Chapter 11 bankruptcy case for cause, pursuant to 11 U.S.C. § 1112(b). During the pendency of this appeal, both parties filed various motions, including ISE's i) motion for sanctions, ii) motion for an order discharging notice of *lis pendens*, and iii) motion to dismiss appeal as moot. Moncada also moved for motion to stay pending appeal.

For the reasons that follow, the Bankruptcy Court's decision is **AFFIRMED**. Because of the affirmance, ISE's motion for discharge notice of *lis pendens* is **GRANTED**. However, ISE's motion for sanctions is **DENIED**. All other motions are **DENIED** as **MOOT**.

# I.  **BACKGROUND**

The background of this dispute was set forth in detail in the December 19, 2017 decision of the Bankruptcy Court, and thus, the Court will only recount the facts relevant to the instant appeal.[1]

## A.  **Factual Background**

Moncada, a wholly owned subsidiary of PVOne, LLC ("PVOne"), was formed for the sole purpose of developing a solar energy project (the "Project") on a portion of land located in Franklin Township, New Jersey (the "Property"). The Property is owned by ISE, a producer of eggs. The parties' relationship began in July 2010, when PVOne and ISE entered into a Land Lease and Solar Purchase Agreement (the "Land Lease Agreement"). PVOne subsequently assigned its interest under the Land Lease Agreement to Moncada.

Moncada's ability to construct the project was contingent upon securing various land use and financing approvals, including financing under the New Jersey Solar Act (the "Solar Act" or "Act"), N.J.S.A. 48:3-87. To encourage the development of solar renewable energy projects, the Solar Act provides tax credits known as Solar Renewable Energy Certificates ("SRECs") and other financial subsidies for solar renewable energy projects developed on certain land. *See generally id*. at 48:3-87(q)-(t). Eligibility to receive SRECs is conditioned upon compliance with the Solar Act's regulatory provisions, which are administered by the New Jersey Board of Public Utilities (the "BPU"). Relevant here, parties interested in receiving SRECs for the development of a solar project must file an application with the BPU. *See id*. at 48:3-87(q)-(r).

The BPU's review process varies based upon the specific "energy year" ("EY") in which the application is submitted. *See id*. at § 48:3-87(q)-(r). An "energy year" is the "the 12-month

---

[1] The relevant facts are drawn from the record on appeal.

period from June 1st through May 31st, numbered according to the calendar year in which it ends." *Id*. at 48:3-51. Specifically, subsection (q) of the Solar Act governs proposals, such as the application submitted by Moncada, filed during the 2014, 2015, and 2016 EYs. *Id*. at 48:3-87(q). At the time of Moncada's application, subsection (q) provided:

> (1) During the energy years of 2014, 2015, and 2016, a solar electric power generation facility project that is not: (a) net metered; (b) an on-site generation facility; (c) qualified for net metering aggregation; or (d) certified as being located on a brownfield, on an area of historic fill or on a properly closed sanitary landfill facility, as provided pursuant to subsection t. of this section may file an application with the board for approval of a designation pursuant to this subsection that the facility is connected to the distribution system. An application filed pursuant to this subsection shall include a notice escrow of $40,000 per megawatt of the proposed capacity of the facility. The board shall approve the designation if: the facility has filed a notice in writing with the board applying for designation pursuant to this subsection, together with the notice escrow; and the capacity of the facility, when added to the capacity of other facilities that have been previously approved for designation prior to the facility's filing under this subsection, does not exceed 80 megawatts in the aggregate for each year. The capacity of any one solar electric power supply project approved pursuant to this subsection shall not exceed 10 megawatts. No more than 90 days after its receipt of a completed application for designation pursuant to this subsection, the board shall approve, conditionally approve, or disapprove the application. The notice escrow shall be reimbursed to the facility in full upon either rejection by the board or the facility entering commercial operation, or shall be forfeited to the State if the facility is designated pursuant to this subsection but does not enter commercial operation pursuant to paragraph (2) of this subsection.

> (2) If the proposed solar electric power generation facility does not commence commercial operations within two years following the date of the designation by the board pursuant to this subsection, the designation of the facility *shall be* deemed to be null and void, and the facility shall not be considered connected to the distribution system thereafter.

*Id*. at 48:3-87(q)(1)-(2)(emphasis added). On July 21, 2017, the New Jersey legislature amended subsection (q) (the "Amendment") by adding the following provision:

> (3) Notwithstanding the provisions of paragraph (2) of this subsection, a solar electric power generation facility project that as of May 31, 2017 was designated as "connected to the distribution system," but failed to commence commercial operations as of that date, shall maintain that designation if it commences commercial operations by May 31, 2018.

*Id.* at 48:3-87(q)(3). Subsection (r) of the Solar Act governs all proposals to receive SRECs outside of those approved pursuant to subsection (q). *Id.* at 48:3-87(r).

On October 15, 2013, PVOne and a firm operating as Hanwha Q CELLS USA Corp. ("Hanwha") applied for SRECs to finance the Project under subsection (q). In connection with that proposal, Hanwha posted a $326,000 escrow deposit with the BPU (the "Escrow Deposit"). On February 14, 2014, the BPU conditionally approved PVOne and Hanwha's application for SRECs in EY 2016 (the "SubQ Award"). The SubQ Award was subsequently assigned to Moncada. In the SubQ Award, the BPU designated the Project as "connected to the distribution system" as of June 1, 2015, and thus, pursuant to the pre-Amendment version of subsection (q) that governed at the time of the Award, the deadline to "commence commercial operations" for the Project was May 31, 2017.

In August 2014, Moncada and ISE terminated the Land Lease Agreement. On December 2, 2014, Moncada and ISE entered into a new agreement for the sale of real estate (the "Land Contract"). Pursuant to the Land Contract, Moncada purchased certain portions of land from ISE, and Moncada was to lease that property to a developer for the purpose of constructing the Project. The Land Contract contained various contingencies and imposed certain obligations on Moncada. Relevant here, the Land Contract required Moncada to obtain various land use approvals, and set a closing date of December 15, 2015. Subsequent amendments to the Land Contract extended the closing date, but provided that either party could terminate the Land Contract if closing did not occur by April 1, 2016.

The Project was beset by delays, including Moncada's failure to secure a developer, and thus, closure did not occur by April 1, 2016. As a result, ISE served Moncada with a notice of termination of the Land Contract (the "Termination Notice") on July 29, 2016. In connection

4

with the Termination Notice, ISE returned the deposit that Moncada had made on the Land Contract, and Moncada cashed the deposit check. Moncada disputes the validity of the Termination Notice, arguing that the parties agreed to extend the closing date to August 15, 2016.

Following the Termination Notice, no work was done on the Project, despite the statutory requirement that the Project "commence commercial operations" by May 31, 2017. N.J.S.A. § 48:3-87(q)(2). Additionally, while the subsequent Amendment to subsection (q) extended the statutory deadline to May 31, 2018, *see id.* at § 48:3-87(q)(3), it is undisputed that the Project did not commence commercial operations by that date. Indeed, as of the date of the instant appeal, Moncada had yet to break ground on the Project. Significantly, Moncada concedes that it has never formally petitioned the BPU for an extension of either the May 31, 2017 or May 31, 2018 deadlines for the Project to commence commercial operations. *See* Moncada's Reply Brief ("Moncada Rep."), at pp. 14-15 (admitting that Moncada never made a formal request for an extension to the BPU, but arguing that such a request was unnecessary).

### B. The Bankruptcy Court Proceedings

On December 16, 2016, Moncada filed a Chapter 11 petition for bankruptcy protection. At the time it commenced its bankruptcy case, Moncada received no income and had no employees, sales, products or physical address. At that time, the SubQ Award was the only asset held by Moncada that would potentially make plan confirmation feasible.

On April 13, 2017, ISE filed a motion to dismiss Moncada's bankruptcy petition, pursuant to 11 U.S.C. § 1112(b), arguing that: (i) the petition was filed in bad faith; and (ii) that there was no reasonable likelihood of rehabilitation. On May 31, 2017, the Bankruptcy Court denied ISE's motion, finding that the bankruptcy filing was not made in bad faith, because it was

done for the purpose of preserving the SubQ Award. In that regard, the court noted that Moncada's ability to develop the Project was contingent upon receiving an extension of the SubQ Award, and that the BPU had discretion to extend the date of designation for the Project.[2] And, recognizing that a decision from the BPU on whether to extend the date of designation was determinative of the viability of the SubQ Award, and thus, the feasibility of plan confirmation, the court denied ISE's motion without ruling on Moncada's likelihood of rehabilitation.

The BPU took no action on or after the May 31, 2017 statutory deadline for the Project to commence commercial operations. On June 14, 2017, ISE filed a motion for reconsideration with respect to its initial motion to dismiss. Specifically, ISE argued that: (i) because the BPU took no action with respect to the Project's commencement deadline, the SubQ Award expired after May 31, 2017; (ii) the automatic stay did not prevent the expiration of the SubQ Award, because the Award expired as a matter of law; and (iii) that the Bankruptcy Court should reach the issue of whether ISE validly terminated the Land Contract.

During the pendency of ISE's motion for reconsideration, New Jersey enacted the Amendment to subsection (q) of the Solar Act, which extended the deadline for the Project to "commence commercial operations" to May 31, 2018. N.J.S.A. § 48:3-87(q)(3). Following this statutory extension, the parties engaged in settlement negotiations, which proved unsuccessful. Thereafter, the Bankruptcy Court held oral argument on the motion for reconsideration on October 17, 2017.

On December 19, 2017, the Bankruptcy Court issued a decision granting ISE's motion for reconsideration and dismissing Moncada's bankruptcy petition for cause, pursuant to 11

---

[2] Significantly, the Bankruptcy Court's initial decision occurred prior to the enactment of the Amendment to subsection (q).

U.S.C. 1112(b) of the Bankruptcy Code, which decision forms the basis of the present appeal. At the outset, the court noted that, in light of the various factual developments and statutory changes since its initial decision, that whether the motion was properly characterized as one for reconsideration or as a renewed motion to dismiss was a "distinction without difference," because the operative question remained the same – "whether, under the current facts and law, there is a reasonable likelihood of rehabilitation for this debtor." *In re Moncada NJ Solar 201, LLC*, No. 16-33967, 2017 WL 6508968, at *2 (Bankr. D.N.J. Dec. 19, 2017). Ultimately, the court held that because Moncada's chances of rehabilitation were contingent upon the continued viability of the SubQ Award, and because there was no dispute that the Project would not commence commercial operations by the May 31, 2018 statutory deadline, – triggering the expiration of the SubQ Award – there was no reasonable likelihood of rehabilitation, and thus, dismissal of the case was warranted.

In reaching that conclusion, the Bankruptcy Court rejected Moncada's arguments that there remained a reasonable likelihood of rehabilitation because: (i) the BPU has discretion to amend the May 31, 2018 deadline; and (ii) the automatic stay precludes the BPU from terminating the SubQ Award without permission of the Court. First, the court found that although the BPU has the ability to modify the date of designation for a solar project, it was not reasonably likely that the BPU would extend the May 31, 2018 statutory deadline for commencing commercial operations on the Project. *Id.* at *4-5. In that regard, the court distinguished this case from *In the Matter of the Petition of True Green Capital Mgmt. LLC for an Extension of the Designation Date Set Forth in the Matter of Augusta Solar Farms*, No. QO13101014, 2016 WL 792233 (Feb. 24, 2016) ("*True Green*"), a case where the BPU granted a petition to modify the date of designation for the at-issue project, noting that in *True Green*, the

BPU merely extended the date of designation to the end of EY 2014, the delay was caused by issues outside of the petitioner's control, and the petitioner was able to certify that it had already expended significant costs for the project and was ready to complete the production expeditiously. *See id.* at *4-5. By contrast, the Bankruptcy Court noted that, here, in order to extend the May 31, 2018 statutory deadline for the Project, the BPU would need to give the Project a date of designation beyond EY 2016, and thus, that Moncada would need "an extension beyond the outside date contemplated in the [subsection (q)]."[3] *Id.* at *5. Additionally, unlike in

---

[3] Significantly, the court questioned, without rendering an affirmative finding, whether BPU had any discretion under the Solar Act to extend the May 31, 2018 statutory deadline, explaining:

> Initially, we note that though the Amendment may not have removed the BPU's discretion, the language of the pre-Amendment Act raises some questions as to the BPU's ability to extend the deadline any further. The Act covered energy years 2014, 2015 and 2016. An energy year ("EY") is the 12–month period from June 1 through May 31, numbered according to the calendar year in which it ends. N.J.S.A. § 48:3–51. Moncada's application was under EY 2016, which ended on May 31, 2016.

> The *Green Tree* decision noted that the date of designation for the projects under EY 2015 and 2016 ran from the start of those EYs, or June 1, 2014 (EY 2015) and June 1, 2015 (EY 2016). Thus, the EY 2015 projects had a deadline of May 31, 2016 to commence commercial operations and the EY 2016 projects (including Moncada) had a deadline of May 31, 2017 to commence commercial operations. In *True Green*, the SubQ Award was under EY 2014. The date of designation for that project was February 14, 2014. The owner only sought an extension to the end of EY 2014, or May 31, 2014, specifically making the argument that "the [BPU] may designate any date within the energy year." *True Green* at p. 5 (emphasis added).

> In this case, the Moncada SubQ Award fell under EY 2016. The last day of that EY would be May 31, 2016. Thus, even if the BPU amended the date of designation to the end of EY 2016, the two-year deadline would expire by May 31, 2018. Pursuant to the Amendment, Moncada already has until that date to commence commercial operations, and it cannot do so. *Petitioning the BPU for a further extension based upon its discretion to modify the date of designation would have the effect of asking the BPU to modify said date to a time that falls not only outside of EY 2016, but also outside of the EYs covered by the Act. This seems illogical and inconsistent with the language of the Act.* This Court is hesitant to find that the BPU is unable, as a matter of law, to extend that date of designation outside the EY year based upon the present record. That said, we note that it is far from clear that the BPU has discretion to extend solar project completion dates beyond the reach of the Act itself. Moncada has not cited a state court proceeding where the BPU has extended a deadline beyond the latest date contemplated

*True Green*, the court noted that Moncada had yet to establish a contractual right to build, had not secured a developer for the Project, and that the delays were caused by contractual and permitting issues within Moncada's control. *Id.* Accordingly, the court found that it was not reasonably likely that the BPU would extend the May 31, 2018 statutory deadline for commencing commercial operations. *Id.*

Second, the court found that terminating the SubQ Award would not violate the automatic stay. *Id.* at *5-7. Specifically, the court rejected Moncada's argument that terminating the SubQ Award requires an "action or proceeding" by BPU, finding such an interpretation at odds "with the language of the Act, which nullifies the award after two years from the date of designation by its own terms. The cancellation would not be the result of the commencement or continuation of any action or proceeding against Moncada, because no action is necessary." *Id.* at *6. Additionally, the court rejected Moncada's argument that New Jersey has a lien on the Escrow Deposit, and thus, that the forfeiture of the Escrow Deposit upon termination of the SubQ Award would amount to an action to enforce a lien and exercise control over the property of the estate, on the grounds that the Escrow Deposit was not a protected asset in Moncada's estate. *Id.* at *7. Accordingly, the court found that the "automatic stay provisions of the [Bankruptcy] Code . . . [did] not protect against the statutory cancellation of Moncada's SubQ Award on May 31, 2018," and thus, that there was "no reasonable likelihood of Moncada's rehabilitation."[4] *Id.*

---

by the Act. This distinction is a factor in determining that rehabilitation is not reasonably likely.

*In re Moncada*, 2017 WL 6508968 at *4 (emphasis added).

[4] The court declined to reach ISE's argument that, even if the May 31, 2018 deadline could be extended, rehabilitation was still impossible in light of the cancellation of the Land Contract. *In re Moncada*, 2017 WL 6508968 at *7 ("Because the Court has concluded that it is not

### C.    The Instant Appeal

On January 1, 2018, Moncada filed this appeal of the December 19, 2017 decision of the

Bankruptcy Court.  ECF No. 1.  Moncada filed a brief in support of its appeal on April 9, 2018.

ECF No. 15.  In its brief, Moncada presents the following issues on appeal:

> I.    Whether the Bankruptcy Court erred by failing to adhere to the principle of
> judicial deference to the exclusive primary jurisdiction of the New Jersey Board
> of Public Utilities to carry out the New Jersey Solar Act when the Bankruptcy
> Court found that the BPU was not "reasonably likely" to modify the date of
> designation of the Solar Project, thereby extending the SubQ Award Deadline
> beyond May 31, 2018?
>
> II.   Whether the Bankruptcy Court erred in finding the automatic stay provisions of
> 11 U.S.C. § 362 of the United States Bankruptcy Code did not protect against
> termination of Moncada's right to obtain the SubQ Award?

Moncada's Appellant Brief ("Moncada's Br."), at 2.[5]  ISE submitted a brief in opposition on

June 8, 2018.  ECF No. 33.  Moncada submitted a reply brief on June 22, 2018.  ECF No. 39.

During the pendency of the present appeal, both parties also submitted numerous motions

that remain unresolved.  Specifically, ISE filed a motion for sanctions, arguing that this appeal

violates Rule 11 because it presents factual contentions that do not have evidentiary support, and

that Moncada filed this appeal for the improper purpose of harassing ISE and needlessly

increasing the cost of litigation.  Moreover, ISE moved for an order discharging notice of *lis*

*pendens* in response to Moncada's filing of a Notice of *Lis Pendens* against the Property at issue

subsequent to the initiation of this appeal.  Finally, ISE also moved to dismiss the appeal as

---

reasonably likely that Moncada will be able to extend the time in which it must comply with the
[Solar Act], we need not reach the issue of whether the Contract was validly terminated. Said
issue implicates New Jersey state law and is more appropriately decided in the New Jersey state
court forum.").

[5] In its brief, Moncada notes that, to the extent that it "omits certain issues that Moncada had
previously included in its designation of the record on appeal and statement of issues to be
presented, those other issues are withdrawn."  Moncada's Br. at 2 n. 2.

moot, contending that because Moncada failed to develop the solar energy project by May 31.

2018, the SubQ Award expired. On the other hand, Moncada has sought to stay the Bankruptcy

Court's Order pending this appeal. This Opinion will resolve all pending motions.

## II. STANDARD OF REVIEW

"The proper standard of review to be applied by a district court when reviewing a ruling

of a bankruptcy court is determined by the nature of the issues presented on appeal." *Baron &*

*Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005). In that

regard, district courts review the bankruptcy court's "legal determinations *de novo* and its factual

findings for clear error." *In Re: J & S Properties, LLC*, 872 F.3d 138, 142 (3d Cir. 2017). Under

the clearly erroneous standard, the bankruptcy court's factual findings will not be disturbed

unless the reviewing court is "left with the definite and firm conviction that a mistake has been

committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (quoting *United*

*States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948)). Where

the issues on appeal present both findings of fact and conclusions of law, the reviewing court

applies "a clearly erroneous standard to 'integral facts,' but exercise[s] plenary review of the

[bankruptcy] court's interpretation and application of those facts to legal precepts." *In re Nortel*

*Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011) (quoting *In re Exide Techs.*, 607 F.3d 957, 962

(3d Cir. 2010)).

In this case, the Bankruptcy Court dismissed Moncada's petition under 11 U.S.C. §

1112(b). Pursuant to § 1112(b), a court may convert or dismiss a bankruptcy case "for cause."

11 U.S.C. § 1112(b). The Bankruptcy Code sets forth a non-exclusive list of sixteen factors that

constitute "cause." *See id*. at § 1112(b)(4). Relevant here, cause to dismiss or convert a

bankruptcy case exists where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *Id*. at § 1112(b)(4).

### III.    **DISCUSSION**

On appeal, Moncada argues that the Bankruptcy Court's decision was erroneous for two reasons. First, Moncada contends that the Bankruptcy Court usurped the "exclusive primary jurisdiction" of the BPU to interpret and "carry out" the Solar Act when it found that the BPU was not reasonably likely to extend the deadline for the Project to commence commercial operations beyond May 31, 2018. Moncada's Br. at 17. Second, Moncada argues that the Bankruptcy Court erred in finding that the automatic stay provisions of 11 U.S.C. § 362 did not protect against the termination of the SubQ Award. *See id*. at 25-33. The Court will address each of these contentions, in turn.

#### A.    **The SubQ Award Expired on May 31, 2018 as a Matter of Law**

Moncada's first argument relates to the Bankruptcy Court's determination that the BPU was not reasonably likely to modify the date of designation for the Project beyond the statutory deadline of May 31, 2018, for commencing commercial operations on the Property. The crux of Moncada's argument is that the BPU has exclusive primary jurisdiction over issues involving the interpretation of the Solar Act, and thus, that the Bankruptcy Court erred in failing to stay its decision and defer to the BPU the issue of whether or not an extension of the May 31, 2018 statutory deadline was permissible, or warranted, under the Solar Act in this case.

In opposition, ISE argues that because May 31, 2018 is the absolute deadline for any project submitted under subsection (q) to commence commercial operations, under the statute, the BPU had no discretion to grant Moncada an extension beyond that date. Additionally, ISE maintains that deference to the BPU was unnecessary, because issues pertaining to the Solar Act

are not within the exclusive purview of the BPU, and Moncada failed to formally petition the BPU for such an extension. I agree.

To determine whether the BPU has any discretionary authority to extend the statutory deadline, the Court must analyze the relevant provisions of the Solar Act. As noted, the SubQ Award represents the BPU's decision to conditionally approve Moncada's application to receive SRECs under subsection (q). Subsection (q) governs proposals to develop solar renewable energy projects in EYs 2014 to 2016. *See* N.J.S.A. 48:3-87(q)(1). Subsection (q)(2) requires all solar projects proceeding under subsection (q)(1) to "commence commercial operations within two years following the date of the designation by the board," otherwise the "the designation of the facility shall be deemed to be null and void, and the facility *shall not* be considered connected to the distribution system thereafter." *See id*. at 48:3-87(q)(2)(emphasis added). However, the Amendment extended the two-year requirement for certain projects, providing as follows:

> (3) Notwithstanding the provisions of paragraph (2) of this subsection, a solar electric power generation facility project that as of May 31, 2017 was designated as "connected to the distribution system," but failed to commence commercial operations as of that date, shall maintain that designation if it commences commercial operations by May 31, 2018.

*Id.* at 48:3-87(q)(3).

With respect to on these provisions, the Bankruptcy Court questioned whether, under the statutory scheme, the BPU had discretion to modify the date of designation for the Project beyond May 31, 2016, the last day of EY 2016, because subsection (q) applies to EYs 2014, 2015, and 2016, and thus, an extension would go beyond the reach of the last EY covered by subsection (q). *See In re Moncada*, 2017 WL 6508968 at *4 ("Petitioning the BPU for a further extension based upon its discretion to modify the date of designation would have the effect of asking the BPU to modify said date to a time that falls not only outside of EY 2016, but also

outside of the EYs covered by the Act. This seems illogical and inconsistent with the language of the Act.").  Nonetheless, the court declined to find that the BPU does not have discretion to extend in light of the clear statutory language; rather, the Bankruptcy Court found that even if the BPU had such discretion, the agency was not reasonably likely to grant such an extension.  I depart from the Bankruptcy Court's decision in this regard.  Because I find, as a matter of statutory interpretation, that subsection (q)(3) imposes an absolute deadline of May 31, 2018 for any project approved under subsection (q)(1) to commence commercial operations, the BPU has no discretion to extend a date of designation for a solar project proceeding under subsection (q)(1) beyond EY 2016.  However, I agree with the ultimate conclusion of the Bankruptcy Court that there is no reasonable likelihood of rehabilitation for Moncada, and that the Court need not defer to the BPU.

In determining whether the Solar Act gives the BPU discretion to extend the date of designation for a project approved under subsection (q)(1) beyond EY 2016, this Court is guided by well-settled principles of statutory construction.  "The role of the courts in interpreting a statute is to give effect to [the legislature's] intent." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).  The starting point for this Court's analysis is the plain language of the statute itself. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989); *see In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009) ("The first step in statutory construction is to consider the plain language of the statute.").  "If the language of the statute expresses [the legislature's] intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000).  However, if the statute is susceptible to multiple interpretations, the Court "must look to the surrounding words and provisions and their context," *Tavarez v. Klingensmith*, 372 F.3d 188,

190 (3d Cir. 2004), including "persuasive legislative history if it exists." *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 907, 910 (3d Cir. 1990); *see Gregg*, 226 F.3d at 257 ("Where the statutory language does not express [the legislature's] intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose.").

Here, the Court need not delve beyond the unambiguous language of the Solar Act to find that the BPU lacks authority to extend the date of designation for the Project beyond EY 2016. At the outset, the plain language of subsection (q)(1) expresses that subsection (q) is applicable to all proposals for solar projects made "[d]uring the energy years of 2014, 2015, and 2016." N.J.S.A. 48:3-87(q)(1). Under the Solar Act, an energy year is the "the 12-month period from June 1st through May 31st, numbered according to the calendar year in which it ends," *id.* at § 48:3-51, and thus, the last date in the final EY covered by subsection (q), EY 2016, is May 31, 2016. Subsection (q)(2) then provides that any solar project approved under subsection (q)(1) must "commence commercial operations within two years following the date of the designation by the [BPU] pursuant to this subsection." *Id.* at 48:3-87(q)(2). If a project fails to commence commercial operations within two years of the date of designation, the project is "deemed to be null and void." *Id.* Accordingly, because the last potential date of designation for a project proceeding under subsection (q)(1) is May 31, 2016, and because all projects must commence commercial operations within two years of the date of designation, the last possible date for any project granted conditional approval under subsection (q)(1) to commence commercial operations is May 31, 2018.

Indeed, the Amendment to subsection (q) did not alter the May 31, 2018 ultimate deadline for projects submitted during EYs 2014 to 2016, but rather, only reinforced this Court's

conclusion that May 31, 2018 is the final commencement date contemplated by the Act for

projects approved under subsection (q). To reiterate, subsection (q)(3) of the Solar Act provides:

> (3) Notwithstanding the provisions of paragraph (2) of this subsection, a solar electric power generation facility project that as of May 31, 2017 was designated as "connected to the distribution system," but failed to commence commercial operations as of that date, shall maintain that designation if it commences commercial operations by May 31, 2018.

N.J.S.A. § 48:3-87(q)(3). In rejecting ISE's assertion that the Amendment set an absolute

statutory deadline of May 31, 2018 for the commencement of commercial operations for projects

approved under subsection (q)(1), the Bankruptcy Court interpreted subsection (q)(3) as follows:

> ISE distinguishes the *True Green* decision and *Brickyard* opinion, arguing that each BPU decision was made prior to the Amendment. ISE asserts that the Amendment set a statutory deadline of May 31, 2018 which removed the BPU's discretion to further extend. We disagree. The Amendment was "notwithstanding" the provisions of the already existing N.J.S.A. § 48:87–3(q)(2)—the subsection from which the BPU's discretion arises. It would do nothing to affect, for example, a project with a date of designation allowing for a deadline after May 31, 2018. The Amendment merely extends the deadline for certain projects. It does not contain language which voids the designation should the May 31, 2018 deadline be missed. The voiding of a designation remains under the purview of subsection (q)(2). Since the BPU has discretion to extend under subsection (q)(2), the Amendment cannot be viewed as an absolute deadline.

*In re Moncada*, 2017 WL 6508968 at *4.

I do not agree with the Bankruptcy Court's interpretation of subsection (q), and note that

the Bankruptcy Court's finding in that regard seemingly conflicts with its subsequent

acknowledgement that the BPU may not be able to extend the date of designation beyond EY

2016. *See In re Moncada*, 2017 WL 6508968 at *4. In that connection, while the Bankruptcy

Court is correct that, pursuant to subsection (q), the BPU has discretion to set the date of

designation for a project, subsection (q) only governs applications to develop solar projects that

were made within the EYs 2014 to 2016, and thus, the last date within the range of that

discretion is May 31, 2016. It follows that, under subsection (q)(2), a project given such a

designation date must commence commercial operations no later than May 31, 2018. Therefore,

while the Bankruptcy Court found that subsection (q)(3) does not affect projects with a date of designation beyond May 31, 2018, subsection (q) does not apply to any such projects in the first instance. Instead, subsection (q)(3) merely extended the deadline to commence commercial operations for projects with an initial date of designation before May 31, 2016, such that those projects would effectively be treated as having a date of designation of May 31, 2016. Stated differently, both before and after the enactment of the Amendment, the last possible deadline for any project seeking an award of SRECs under subsection (q) to commence commercial operations was May 31, 2018, two years after the last day of the final EY covered in subsection (q), *i.e.*, May 31, 2016. Accordingly, the statute is clear: the BPU had no discretion to extend the date of designation for the Project beyond May 31, 2016, or to extend the deadline for commencing commercial operations beyond May 31, 2018.[6]

Indeed, a finding that the BPU had discretion to extend the date of designation beyond May 31, 2016 would subvert the plain language of the statute, which sets forth an entirely different application process for projects submitted after EY 2016. "Subsection r mandates that the [BPU] evaluate *all proposed projects for which applications are submitted on or after June 1, 2016* according to" the criteria listed in that provision. *In the Matter of the Implementation of L. 2012, C. 24, the Solar Act of 2012; in the Matter of the Implementation of L. 2012, C. 24, the Solar Act of 2012, N.J.S.A. 48:3-87(q)(r) & (s) - Proceedings to Establish the Processes for Designating Certain Grid-Supply Projects As Connected to the Distribution System; & in the Matter of the Implementation of N.J.S.A. 48:3-87(r), Designating Grid-Supply Projects As Connected to the Distribution Sys. - Order*, 2017 WL 3316331, at *3 (July 26, 2017) (emphasis

---

[6] Tellingly, Moncada fails to cite a single instance in which the BPU extended the deadline for a project approved under subsection (q) to commence commercial operations beyond May 31, 2018.

added); *see* N.J.S.A. 48:3-87(r).  In other words, applications to receive SRECs for solar projects that are submitted after EY 2016 are evaluated under subsection (r) rather than under subsection (q).  Moreover, subsection (r) sets forth an entirely different regulatory review scheme than subsection (q), providing:

(1) For all proposed solar electric power generation facility projects except for those solar electric power generation facility projects approved pursuant to subsection q. of this section, and for all projects proposed in energy year 2019 and energy year 2020, the board may approve projects for up to 50 megawatts annually in auctioned capacity in two auctions per year as long as the board is accepting applications. If the board approves projects for less than 50 megawatts in energy year 2019 or less than 50 megawatts in energy year 2020, the difference in each year shall be carried over into the successive energy year until 100 megawatts of auctioned capacity has been approved by the board pursuant to this subsection. A proposed solar electric power generation facility that is neither net metered nor an on-site generation facility, may be considered "connected to the distribution system" only upon designation as such by the board, after notice to the public and opportunity for public comment or hearing. A proposed solar power electric generation facility seeking board designation as "connected to the distribution system" shall submit an application to the board that includes for the proposed facility: the nameplate capacity; the estimated energy and number of SRECs to be produced and sold per year; the estimated annual rate impact on ratepayers; the estimated capacity of the generator as defined by PJM for sale in the PJM capacity market; the point of interconnection; the total project acreage and location; the current land use designation of the property; the type of solar technology to be used; and such other information as the board shall require.

(2) The board shall approve the designation of the proposed solar power electric generation facility as "connected to the distribution system" if the board determines that:

(a) the SRECs forecasted to be produced by the facility do not have a detrimental impact on the SREC market or on the appropriate development of solar power in the State;

(b) the approval of the designation of the proposed facility would not significantly impact the preservation of open space in this State;

(c) the impact of the designation on electric rates and economic development is beneficial; and

(d) there will be no impingement on the ability of an electric public utility to maintain its property and equipment in such a condition as to enable it to provide safe, adequate, and proper service to each of its customers.

(3) The board shall act within 90 days of its receipt of a completed application for designation of a solar power electric generation facility as "connected to the distribution system," to either approve, conditionally approve, or disapprove the application. If the proposed solar electric power generation facility does not commence commercial operations within two years following the date of the designation by the board pursuant to this subsection, the designation of the facility as "connected to the distribution system" shall be deemed to be null and void, and the facility shall thereafter be considered not "connected to the distribution system."

N.J.S.A. 48:3-87(r).

By its unambiguous terms, the Solar Act requires applications for SRECs during EYs 2014 through 2016 to be submitted under subsection (q), and applications submitted outside the ambit of subsection (q) to be submitted under subsection (r).  *See* N.J.S.A. 48:3-87(q)-(r).  And, significantly, projects submitted under subsection (r) are subject to a more stringent set of criteria than applications submitted under subsection (q).  *Compare* N.J.S.A. 48:3-87(q), *with* N.J.S.A. 48:3-87(r).  Accordingly, in order to accept Moncada's argument that the BPU retains discretion to extend the date of designation for the Project beyond EY 2016, it would contravene the plain language of the statute which provides that an application made in EYs 2014 – 2016 be governed by subsection (q) rather than any other subsections.  It is not the legislature's intent to permit an applicant that proceeded under subsection (q) to commence a project beyond the deadline date of May 30, 2018, without incurring the burdens of having to comply with the more stringent regulatory requirements of an application proceeding under subsection (r).  Because the Bankruptcy Court's interpretation is not supported by the plain language of the statute, I reject the notion that the BPU retains discretion to extend the date of designation for a project approved under subsection (q) beyond EY 2016.

Moreover, *True Green*, the principal case cited by Moncada for the proposition that the BPU retains discretion to modify the date of designation, is distinguishable from the case at bar. In *True Green*, the proponent of a solar facility filed a verified petition with the BPU seeking an

extension of the date of designation for a project that had been conditionally approved under subsection (q). *See* 2016 WL 792233 at *1. Specifically, in a 2014 order, the BPU set the designation date for the at-issue project as February 14, 2014, and thus, to be eligible to receive SRECs under subsection (q), the project had to commence commercial operations no later than February 14, 2016. *See id*. at *3. In its verified petition, the proponent requested that the date of designation for the project be extended to the final day of EY 2014 (May 31, 2014), to allow the project until May 31, 2016 to commence commercial operations. *Id.* at *4. In support of its request, the proponent noted that various events out of its control had caused delays in construction, including non-delivery of racking from its initial manufacturer (which it had since replaced) and a severe winter storm. *See id*. The proponent also explained that it had already made "extensive preparations . . . to complete construction expeditiously," spending more than $7 million toward construction and purchasing all major equipment. *Id.* In support of its petition, the proponent argued than an extension of the designation date is permitted, because the Solar Act does not specify the date from which a solar project is designated by the BPU, and thus, the BPU "may designate any date within the energy year, including the last date of the energy year." *Id.* at *4.

At the outset of its decision, the BPU clarified that it was exercising its discretionary authority to "modify a prior decision" under N.J.S.A. § 48:2-40(e) in determining whether a modification of the initial date of designation was appropriate in that case. *Id.* at *5. Based on its review of the petition, the BPU concluded that "considerations of equity" supported a modification of the date of designation for the project "from February 14, 2014 to the final day of *that energy year*, May 31, 2014." *Id.* at *6 (emphasis added). The BPU reasoned that, although subsection (q) "requires a proposed solar facility to achieve commercial operations

within (2) two years of the date the [BPU] has designated it as 'connected to the distribution system' or forfeit its designation," the legislature invested the BPU with discretion in setting that date. *Id.* at *5. The BPU stated that it set the initial designation date for the project pursuant to this discretion, and, based on the "unique" situation presented by that case, a limited extension to the end of EY 2014 was warranted.

As the foregoing discussion illustrates, in *True Green*, the proponent merely sought an extension of the BPU's initial date of designation for the project to a later date within the same EY, which had the effect of extending the ultimate compliance date for the at-issue project to May 31, 2016. Conversely, here, the BPU set an initial date of designation for the Project of June 1, 2015, which would have required the Project to commence commercial operations by May 31, 2017.[7] As a result of the Amendment, however, the commencement deadline for the Project was extended to May 31, 2018, which is two years from the last date of designation in EY 2016, May 31, 2016. As the Court has already noted, subsection (q) requires that all projects approved thereunder commence commercial operations within two years of the date of designation. Accordingly, to grant Moncada a further extension, the BPU would have to modify the date of designation beyond EY 2016, into EY 2017, a period that falls outside subsection (q). Therefore, while the Court is cognizant that the BPU has certain discretion to set the date of designation for a project, I cannot find that the BPU has discretion to move the date of designation beyond the EYs contemplated under subsection (q). Simply put, while subsection

---

[7]     I note that the facts in this case are distinguishable from those of *True Green*. In *True Green*, the project delays were not caused by the applicant, and the applicant had made substantial preparations to complete construction, spending more than $7 million toward purchasing all major equipment. In this case, based on the record, no substantial preparations were made by Moncada to start construction; in fact, Moncada had failed to secure a developer by the deadline, and as such, no work had begun.

(q) grants the BPU discretionary authority to set the date of designation, that discretion is also limited by the statute, which expressly confines subsection (q) from EYs 2014 to 2016.

In sum, I find that although the BPU has limited discretion in setting the date of designation for a solar project approved under subsection (q)(1) of the Solar Act, that discretion is limited to the confines of the statute. Specifically, subsection (q) sets forth certain criteria for proposed solar projects in the EYs 2014, 2015, and 2016, and conditions the eligibility for any project approved thereunder to receive SRECs on commencing commercial operations within two years of the date of designation. While the BPU retains discretion to set the date of designation within the energy years covered by subsection (q), the Court cannot find that such discretion enables the BPU to set a designation date outside of those energy years. To hold otherwise would contravene the plain meaning of the statute, by allowing the BPU to, in effect, amend subsection (q) to cover energy years beyond EY 2016, when the Solar Act expressly provides that all proposals for solar projects after EY 2016 must be evaluated under subsection (r). Thus, because Moncada would require an extension of the date of designation beyond EY 2016 in order for the SubQ Award to remain viable, and because the BPU has no discretion to grant such an extension, I find that the SubQ Award was terminated upon the failure of the Project to commence commercial operations by May 31, 2018. And, accordingly, because the SubQ Award was the only asset held by Moncada that had the potential to make plan confirmation feasible, I affirm the Bankruptcy Court's finding that dismissal of the petition was appropriate, albeit for slightly different reasons.

**B.     The Automatic Stay does not Preclude the Expiration of the SubQ Award**

Next, Moncada argues that the Bankruptcy Court erred in finding that the automatic stay provision of the Bankruptcy Code did not protect against the statutory termination of the SubQ

Award.  In making that finding, the Bankruptcy Court reasoned that although the automatic stay
protects debtors against the commencement or continuation of administrative proceedings, the
BPU need not take any action to terminate the SubQ Award.  *In re Moncada*, 2017 WL 6508968
at *6.  Rather, pursuant to the language of subsection (q), the award is nullified after two years
"by its own terms."  *Id.*  In other words, the termination of the Award "would not be the result of
the commencement or continuation of any action or proceeding against Moncada, because no
action is necessary."  *Id.*  The court rejected Moncada's attempt to analogize this case to cases
where various courts had found that the automatic stay precluded regulatory agencies from
revoking licenses, noting that an affirmative act was required by each of those agencies.  *Id.*  By
contrast, here, the court found that the "[Solar] Act requires no such action on the part of the
BPU—the SubQ Award is 'deemed to be null and void' by operation of the statute without any
declaration or revocation."  *Id.*

Additionally, the Bankruptcy Court rejected Moncada's argument that New Jersey has a
lien on the Escrow Deposit, and thus, that the forfeiture of the Escrow Deposit upon termination
of the SubQ Award would amount to an action to enforce a lien and exercise control over the
property of the estate.  *Id.* at *7.  To that end, the court explained:

> As noted by ISE, the Escrow Deposit upon which Moncada bases its theory was posted
> by a non-debtor, [Hanwha]. The escrow agreement between Hanwha and the BPU
> explicitly stated that "[a]ll funds deposited in the escrow account shall not be considered
> an asset of [Hanwha] and shall not be available to any creditor of [Hanwha] in the event
> of bankruptcy . . ." Moncada did not list the Escrow Deposit on its schedule of assets,
> despite the fact that it listed other deposits and escrow accounts. The Escrow Deposit
> cannot be considered property of the Moncada debtor estate, as it is difficult to fashion a
> legal theory under which Moncada has any interest in an escrow posted by a third-party
> which specifically acknowledges that the escrow is not even the property of that third-
> party. Therefore, 11 U.S.C. §§ 362(a)(4) & (5) are not implicated.

*Id.*  Accordingly, the Bankruptcy Court found that the stay did not protect against the statutory
termination of the SubQ Award.

On appeal, Moncada argues that the Bankruptcy Court erred in finding that the automatic stay does not protect against the termination of the SubQ Award, because: (i) the termination of the Award does not occur by operation of law, but rather, requires an "act" on the part of the BPU; and (ii) the Escrow Deposit is property of the estate, and the BPU must act to transfer it to the state. I disagree.

The automatic stay provision is codified in section 362(a) of the Bankruptcy Code. The automatic stay "provides one of the fundamental protections for debtors found in the Bankruptcy Code." *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011). Specifically, § 362 provides, in relevant part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
>> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>>
>> . . .
>>
>> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>>
>> (4) any act to create, perfect, or enforce any lien against property of the estate;
>>
>> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
>>
>> . . .

11 U.S.C. § 362(a). "The stay mandated by this provision is automatic in that the debtor does not have to make any formal request that it be issued or that it apply to a particular proceeding.

Rather, the onus is on the party seeking to proceed to petition the Bankruptcy Court for relief from the stay." *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006).

Here, Moncada argues that the termination of the SubQ Award requires an "act" on the part of the BPU, and thus, that the automatic stay precludes the BPU from taking such an action against Moncada's property. In support, Moncada relies on *In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253, 257 (Bankr. S.D.N.Y.), *subsequent mandamus proceeding sub nom. In re F.C.C.*, 208 F.3d 137 (2d Cir. 2000). In *NextWave*, the debtor moved for an order holding that a post-petition declaration issued by the Federal Communications Commission ("FCC") was null and void as violative of the automatic stay. *See id*. at 257-58. In the challenged declaration, the FCC stated that the debtor's licenses to provide telecommunications services were automatically cancelled for failure to pay in full the value of the debtor's installment obligations. *See id.* at 257-58. In support of its position that the licenses were automatically cancelled, the FCC cited to 47 C.F.R. § 1.2110(f)(4)(iv), which provides:

> (iv) Any eligible entity that submits an installment payment after the due date but fails to pay any late fee, interest or principal at the close of the 90–day non-delinquency period and subsequent automatic grace period, if such a grace period is available, *will be declared in default*, its license will automatically cancel, and will be subject to debt collection procedures.

*Id.* (emphasis added). As noted by the court, under that regulation, "a 'default' must 'be declared' before 'automatic' cancellation can occur." *In re NextWave*, 244 B.R. at 264.

In finding that the FCC's declaration violated the automatic stay, the *NextWave* court distinguished the at-issue regulation from cancellation provisions in two cases cited by the FCC – *In re Gull Air, Inc.*, 890 F.2d 1255 (1st Cir. 1989) and *In re Yellow Cab Co-op. Ass'n*, 132 F.3d 591 (10th Cir. 1997) – "where cancellation involved no action and no exercise of judgment or

discretion on the part of the administrative agency." *In re NextWave*, 244 B.R. at 265.

Specifically, the court explained:

> The licenses for airport landing slots in *Gull Air* and taxicab medallions in *Yellow Cab*, by their terms, depended for their continued existence on actual utilization of the landing slots and taxicab medallions and lapsed when no longer used. Thus, termination of the licenses took place with no act, declaration, judgment or discretion exercised or exercisable by the regulatory agency.
>
> The facts are quite different here. Cancellation in this case is not predicated on a "use it or lose it" requirement, but upon delay in payment. The regulation involved requires the FCC to do something (declare a default), and the FCC has the power, in its sole judgment and discretion, to suspend, reinstate and repeatedly change deadlines for payment of C and F block spectrum licenses, both generally and for specific licensees, and to waive payment defaults, and it has repeatedly exercised that power, all as documented in Appendix A.

*Id.*

Here, contrary to Moncada's arguments, I find that the automatic stay does not protect Moncada against the termination of the SubQ Award. In that regard, as the Court has already found, the plain and unambiguous language of the Solar Act provides that any solar project approved pursuant to subsection (q) must commence commercial operations no later than May 31, 2018. In the event that a project is not operational by that date, the award thereunder expires as a matter of law. Thus, unlike the FCC in *NextWave*, in these circumstances, the BPU has no discretionary authority to waive the requirement that the Project commence commercial operations by that statutory deadline set forth in the subsection (q). Nor does the termination require the BPU to act in order to effectuate such a termination under the Solar Act.

Indeed, this case is more akin to *Gull Air*. In *Gull Air*, the First Circuit held that the automatic stay did not protect the debtor against the termination of its rights to four slots at LaGuardia airport, where the applicable Federal Aviation Administration ("FAA") regulation stated that the slots "shall be recalled by the FAA" for non-use. *In re Gull Air*, 890 F.2d at 1261

(quoting 14 C.F.R. § 93.227(a)). In reaching that conclusion, the court rejected the debtor's arguments that the withdrawal of the slots constituted an administrative action or proceeding under § 362(a), because the withdrawal did not "involve a discretionary decision or deliberation by the FAA." *In re Gull Air*, 890 F.2d at 1263. Rather, under the "use it or lose" provision in the FAA regulation, the debtor's "interest expired automatically upon [the] failure to use the slots as required by the FAA regulations." *Id.* at 1264.

Similarly, here, Moncada's interest in the SubQ Award expired automatically by operation of subsection (q) of the Solar Act upon the Project's failure to commence commercial operations by the May 31, 2018 deadline, because the BPU had no discretion to amend the deadline beyond that date. As in *Gull Air*, the applicable statutory provision in this case is phrased in a mandatory term, providing that, where a project proposed under subsection (q) is not commercially operational by the applicable deadline, "the designation of the facility *shall be deemed to be null and void*, and the facility shall not be considered connected to the distribution system thereafter." N.J.S.A. § 48:3-87(q)(2)(emphasis added). Under circumstances presented in this case, once the May 31, 2018 deadline passed, no affirmative action was required on the part of the BPU to terminate the SubQ Award; rather, the SubQ Award terminated as a matter of

law by the plain terms of the Solar Act.[8]  Accordingly, Moncada's interest is not protected by the

automatic stay.[9]

---

[8]  Although not raised by the parties, it appears that even if the BPU were required to affirmatively act to terminate the SubQ Award, the automatic stay would not apply pursuant to the police and regulatory power exception under 11 U.S.C. § 362(b)(4).  Briefly, under that subsection, the filing of a bankruptcy petition does not operate as a stay "by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power . . . ."  11 U.S.C. § 362(b)(4).  This exception serves to discourage "'debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare (*e.g.*, environmental and/or consumer protection regulations).'"  *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011) (citation omitted); *Penn Terra Ltd. v. Dep't of Envtl. Res., Com. of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984).  Courts employ a two-part test to determine whether the police or regulatory power exception is applicable.  First, because the exception applies to the "commencement or continuation of an action or proceeding *by a governmental unit*," 11 U.S.C. § 362(b)(4) (emphasis added), the entity seeking to invoke the exception must be a "governmental unit."  *In re Nortel*, 669 F.3d at 138.  Second, courts ask whether the governmental action is in pursuance of public policy or a pecuniary purpose.  *Id*. at 139.

     Here, it is beyond dispute that the BPU qualifies as a "governmental unit." Next, the enforcement of the absolute deadline for commencing commercial operations set forth in subsection (q) of the Solar Act falls within the purview of the police or regulatory power exception. Indeed, the purpose of the Solar Act is "to encourage the development of solar energy." *Matter of Implementation of L. 2012, C. 24, Solar Act of 2012*, No. A-4666-15T3, 2017 WL 4700553, at *1 (N.J. Super. Ct. App. Div. Oct. 20, 2017).  To do so, the Act offers potential developers the opportunity to obtain SRECs and other financial subsidies for the development of renewable solar energy projects. *See In re Implementation of L. 2012, C. 24, N.J.S.A. 48:3-87(t)*, 443 N.J. Super. 73, 75, 127 A.3d 711, 713 (App. Div. 2015).  However, access to those financial subsidies is contingent upon compliance with the standards set forth in the Solar Act, including the deadline to commence commercial operations set forth in subsection (q).  Thus, action by the BPU to enforce compliance with those requirements, including the termination of a project that fails to meet the statutory deadline for achieving operational status, is in furtherance of the broader policy of promoting the development and generation of clean, renewable energy in the state of New Jersey.  Even assuming that the BPU would be required to "act" to terminate the SubQ Award, it appears because such action would be in furtherance of a legitimate regulatory purpose, the automatic stay does not shield Moncada from having to comply with the statutory deadline set forth in subsection (q).

[9]  Additionally, the Court agrees with the Bankruptcy Court's finding that, because the agreement underlying the Escrow Deposit expressly provided that the Escrow Deposit could not be recoverable by any creditor in the event of bankruptcy, the Escrow Deposit cannot provide the basis for finding that 11 U.S.C. §§ 362(a)(4) or (5) are implicated.

In sum, I find that: (i) the BPU has no discretion to amend the statutory deadline for solar renewable energy projects proceeding under subsection (q) of the Solar Act to commence commercial operations beyond May 31, 2018, and thus, that the SubQ Award expired as a matter of law when the Project failed to commence commercial operations by that deadline; and (ii) that the automatic stay does not preclude the termination of the SubQ Award. Accordingly, the Bankruptcy Court's decision to dismiss Moncada's bankruptcy case for cause is affirmed.

### C. ISE's Motion for Sanctions and Motion to Discharge Notice of *Lis Pendens*

ISE seeks sanctions against Moncada pursuant to Fed. R. Civ. P. 11, on the bases that Moncada's bankruptcy appeal is not factually or legally supported, and that the motivating factor to file such an appeal is grounded in harassment. I summarily deny ISE's request. First, having considered the legal issues at hand, I cannot find that the arguments made by Moncada on this appeal are so frivolous that Rule 11 sanctions are warranted, particularly since I agreed, in part, with Moncada's arguments. *See Dura Sys., Inc. v. Rothbury Investments, Ltd.*, 886 F.2d 551, 556 (3d Cir. 1989)(finding that Rule 11 sanctions may be imposed only "in the exceptional circumstance where the claim or motion is patently unmeritorious or frivolous."). Second, there exists no credible evidence that Moncada brought this appeal to solely harass ISE or to duplicate proceedings. Because Rule 11 sanctions must be imposed in the rarest instances, ISE's motion for sanctions, here, is denied.

However, ISE's motion to discharge Moncada's notice of *lis pendens* is granted. During the pendency of this appeal, Moncada filed a notice of *lis pendens* on the Property at issue. Because the Bankruptcy Court's decision to dismiss Moncada's petition is affirmed, the notice of *lis pendens* necessarily must be discharged as this appeal concludes the parties' lawsuit.

Finally, ISE's motion to dismiss and Moncada's motion to stay are both denied as moot.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the decision of the Bankruptcy Court to dismiss Moncada's bankruptcy case for cause, pursuant to 11 U.S.C. § 1112(b), is affirmed.  ISE's motion for sanctions is denied; however, its motion to discharge *lis pendens* is granted.  All other motions are denied as moot.


Dated:  September 7, 2018                                    /s/ Freda L. Wolfson
                                                            Hon. Freda L. Wolfson
                                                            United States District Judge